UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ISMETA MURATOVIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:19-CV-2290-SPM |
| | ) | |
| | ) | |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner") denying the application of Plaintiff Ismeta Muratovic ("Plaintiff") for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 5). Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

I.    STANDARD FOR JUDICIAL REVIEW

The decision of the Commissioner must be affirmed if it "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 58 F.3d 979, 981 (8th Cir. 2008)); *see also* 42 U.S.C. § 405(g). "Under the substantial-evidence standard, a court looks to an

existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942 (quotation marks omitted). *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In December 2016, Plaintiff applied for DIB, alleging that she became unable to work on September 8, 2016. (Tr. 137-38). In her application paperwork, she alleged an inability to work due to major depressive disorder and panic attacks. (Tr. 160). Her application was initially denied (Tr. 64), and she filed a request for a hearing before an ALJ (Tr. 69-70). On September 27, 2018,

the ALJ held a hearing. (Tr. 27-49). On January 7, 2019, the ALJ issued an unfavorable decision, finding Plaintiff not disabled. (Tr. 7-20). Plaintiff requested review by the Social Security Administration's Appeals Council, and on June 10, 2019, the Appeals Council declined to review the case. (Tr. 1-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

In her Function Report, dated February 27, 2017, Plaintiff reported that she has poor sleep due to nightmares, is tired during the day, has panic attacks in crowds and noisy places,  has anxiety when meeting new people, has a lack of concentration and focus, and is forgetful. (Tr. 169). She cooks simple meals of Bosnian heritage, such as breads, sandwiches, and stews; she does this two to four times a week for a couple of hours a day. (Tr. 171). She also does light cleaning, vacuuming, and laundry, though she needs help and encouragement with those tasks. (Tr. 171). She shops in stores, but she does not drive because she is too afraid to do so. (Tr. 172). Her husband handles bills and money because of her poor English, forgetfulness, and lack of focus. (Tr. 172). Her anxiety prevents her from getting along well with others and following instructions, and she has been traumatized by authority figures due to her experiences in the Bosnian war. (Tr. 174). However, she does spend time with others, visiting her daughter and son-in-law and talking on the phone with family in Bosnia. (Tr. 173).

At the September 27, 2018 hearing before the ALJ, Plaintiff testified as follows. She was 57 years old as of the date of the hearing and has an eighth grade education. (Tr. 32-33). She sometimes tries to do something around the house, but she loses the will to do it and goes to her room to lie down. (Tr. 34). She has trouble sleeping and has nightmares. (Tr. 35). In 2017, she took a trip to Bosnia to see her sister and to go to visit the graves of family members; her children thought it might make her feel better, but it did not. (Tr. 36). Plaintiff cannot focus. (Tr. 37). She

takes medications for depression, anxiety, panic attacks, and nightmares. (Tr. 38).She cannot concentrate. (Tr. 40).

With respect to the medical records, the Court accepts the facts as presented in Plaintiff's statement of facts and Defendant's response. Briefly, the record contains medical treatment records from several providers, including Plaintiff's primary care physician, Plaintiff's psychiatrist, Plaintiff's orthopedist, and Plaintiff's physical therapist. It also contains opinion evidence regarding Plaintiff's mental ability to function from Plaintiff's treating psychiatrist and from a state agency medical consultant. The Court will cite to specific portions of the record as needed to address the parties' arguments.

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. § 423(d)(2)(A).

4

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii); *McCoy*, 648 F.3d at 611. To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. § 1520(a)(4), which "the most [a claimant] can do despite [his or her] limitations," 20 C.F.R. § 404.1545(a)(1). *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant

cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1560(c)(2).

## IV.   THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff met the insured status requirements of the Act through December 31, 2021 (Tr. 14); that Plaintiff has not engaged in substantial gainful activity since September 8, 2016, the alleged onset date (Tr. 14); that Plaintiff has the severe impairments of major depressive disorder and post-traumatic stress disorder (Tr. 14); and that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 15). The ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant's work is limited to simple, routine, and repetitive tasks. Her work should be in a low stress job, defined as having only occasional changes in the work setting. She should have no interaction with the public. She should not work in a fast-paced production job. She should have less than occasional interaction with co-workers, only occasional interaction with supervisors, and can complete no tandem tasks.

6

(Tr. 17). At Step Four, relying on the testimony of a vocational expert, the ALJ found that Plaintiff

was capable of performing her past relevant work as a cleaner/housekeeper. (Tr. 19). Accordingly,

the ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from

September 8, 2016, through the date of his decision. (Tr. 20).

     **V.**     **DISCUSSION**

     Plaintiff challenges the ALJ's decision on three grounds, arguing that (1) the ALJ failed to

properly weigh the opinion of Plaintiff's treating psychiatrist, Jeffrey Pevnick, M.D.; (2) the RFC

assessment is not supported by substantial evidence, including some medical evidence; and (3) the

ALJ erred in determining that Plaintiff's left shoulder impairment was non-severe.

     **A.  The Opinion of Plaintiff's Treating Psychiatrist**

     On September 20, 2018, Dr. Pevnick completed a Mental Medical Source Statement for

Plaintiff, on which he checked boxes indicating that Plaintiff would have "extreme" or "marked"

limitations in every area of mental functioning. (Tr. 360-63). Dr. Pevnick opined that Plaintiff

would have extreme limitations in the ability to maintain necessary concentration to persist and

simple routine tasks eight hours a day, five days per week; extreme limitations in the ability to

initiate and complete tasks in a timely manner; marked limitations in the ability to ignore or avoid

distractions; and extreme limitations in the ability to sustain an ordinary routine and regular

attendance. (Tr. 361). He opined that if Plaintiff were required to perform simple tasks in a low-

stress environment, for a full eight-hour workday five days per week, her overall pace of

production would be 31% or more below average. (Tr. 361). He opined that she would miss work

due to psychologically-based symptoms three times a month or more and would be late to work or

need to leave work early three times a month or more. (Tr. 360). He opined that she would have

marked limitations in the ability to follow one-or two-step oral instructions to carry out a task;

extreme limitations in the ability to use reason and judgment to make work-related decisions; extreme limitations in the ability to understand and learn terms, instructions, and procedures; extreme limitations in the ability to function independently; extreme limitations in the ability to work a full day without needing more than the allotted number or length of rest periods; marked limitations in the ability to distinguish between acceptable and unacceptable work performance; and extreme limitations in the ability to regulate emotions, control behavior, and maintain well-being in a work setting. (Tr. 360). He opined that she would have extreme limitations in the ability to keep social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness; to ask simple questions or request help; to maintain socially acceptable behavior; and to respond appropriately to requests, criticism, suggestions, corrections, and challenges. (Tr. 362). He found that she could not perform in proximity to coworkers without being distracted by them or without distracting them due to exhibition of abnormal behaviors. (Tr. 362). He found that she could not consistently perform for supervisors without exhibiting insubordinate behavior in response to supervision (e.g., verbally refusing to follow instructions). (Tr. 362). He found that she could not perform in a setting with any contact with the general public. (Tr. 362). He also stated that in his opinion, the limitations had lasted or could be expected to last twelve continuous months at the assessed severity. (Tr. 362). He noted that he had been treating Plaintiff since October 2016. Her diagnosis was post-traumatic stress disorder ("PTSD"). (Tr. 363). He noted that she is withdrawn and uncommunicative and has symptoms of PTSD with nightmares, flashbacks, and avoidance/hypervigilance. (Tr. 363). He also noted that she does not communicate and will not respond to greetings or answer questions. (Tr. 363).

Under the regulations applicable to Plaintiff's claim, Dr. Pevnick is considered a "treating source" whose opinion must be evaluated pursuant to 20 C.F.R. § 404.1527(c)(2).[1] If the Commissioner finds that a treating source's medical opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Social Security Administration will give that opinion "controlling weight." *Id.* When the ALJ does *not* give a treating physician's opinion controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ may discount a treating physician's opinion where, for example, "other medical assessments are supported by better or more thorough medical evidence," *Goff*, 421 F.3d at 790 (internal quotation marks omitted), or the opinion "is inconsistent with the physician's clinical treatment notes," *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). "When an ALJ discounts a treating physician's opinion, [the ALJ] should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted). *See also* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

---

[1] These regulations apply to claims filed before March 27, 2017. For claims filed after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated. *See* 20 C.F.R. § 404.1520c(a). Because Plaintiff's claim was filed in 2016, the Court will apply the version of the regulations that applies to claims filed before March 27, 2017.

Here, the ALJ gave "little weight" to most of the limitations in Dr. Pevnick's opinion, finding "extreme limitations are not supported by the objective medical record, nor Dr. Pevnick's own treatment notes (which show a reserved attitude, intact memory and fair insight)." (Tr. 16). However, the ALJ gave substantial weight to Dr. Pevnick's opinion that Plaintiff would not respond to greetings or answer questions, because the ALJ observed those limitations during Plaintiff's testimony. (Tr. 16). Elsewhere in his decision (prior to the assessment of Dr. Pevnick's opinion), the ALJ discussed many more of Dr. Pevnick's treatment notes and objective findings. (Tr. 15-16). In finding that Plaintiff had only a moderate limitation in understanding, remembering, and applying information, the ALJ noted Dr. Pevnick's findings that Plaintiff had a logical and goal-directed thought process, normal cognition, intact recent and remote memory, and mildly impaired judgment. (Tr. 15). In finding that Plaintiff had marked limitations in interacting with others, he noted Dr. Pevnick's observations that Plaintiff did not greet Dr. Pevnick and ignored questions. (Tr. 15). He also noted Dr. Pevnick's findings that Plaintiff often had a guarded, reserved, or uncooperative attitude; sometimes had delayed speech and psychomotor retardation; and sometimes had poor eye contact, but other times had normal speech, normal eye contact, and normal psychomotor activity. (Tr. 15). In finding that Plaintiff had a moderate limitation in adapting and managing oneself, the ALJ noted Dr. Pevnick's findings of depressed or anxious mood, blunt or flat affect, reserved attitude, and low self-worth, but also a well-groomed appearance and an absence of suicidal or homicidal ideation. (Tr. 16). The Court also notes that in the most recent notes addressing Plaintiff's mental condition, Plaintiff's other treatment providers described her as pleasant and cooperative, with a normal affect. (Tr. 272, 314). The ALJ also discussed, at various points in the decision, Plaintiff's daily activities, the fact that Plaintiff never

received inpatient treatment, and the fact that Plaintiff experienced some improvement with medications. (Tr. 15-16, 18).

Whether the ALJ's decision to discount the opinions in Dr. Pevnick's treatment notes was supported by substantial evidence presents a somewhat close question. The Court's own review of Dr. Pevnick's treatment notes shows that they contain numerous objective findings and observations that appear to provide support for his opinions, including findings of poor eye contact; a guarded attitude; a low, depressed, and/or anxious mood; a blunted or flat affect; delayed speech; thought content showing helplessness, low self-worth, and/or flashbacks; and mildly or moderately impaired judgment. (Tr. 254, 257, 259, 261, 263, 343, 345-46, 347, 349-50, 351-52, 354, 357) Dr. Pevnick also occasionally noted symptoms such as anhedonia (Tr. 254), lack of focus (Tr. 257), or disheveled appearance (Tr. 261, 349). In addition, Dr. Pevnick's notes indicate that Plaintiff's medication regimen did not fully control her symptoms, because Dr. Pevnick was frequently adding and discontinuing medications for her throughout the treatment period, including Prozac, Wellbutrin XL, Effexor XL, Lexapro, and Cymbalta. (Tr. 254, 257, 263, 343, 345, 347, 349, 353, 356).

However, after careful review of the record as a whole, and keeping in mind that the Court's role is limited and the Court may not substitute its judgment for that of the ALJ, the Court concludes that the ALJ gave good reasons, supported by substantial evidence, for his decision to partially discount Dr. Pevnick's opinion.

Significantly, the ALJ did not entirely disregard the limitations in Dr. Pevnick's opinion, and the ALJ included very significant mental limitations in the RFC. The ALJ gave substantial (though not controlling) weight to Dr. Pevnick's opinion that Plaintiff will not respond to greetings or answer questions. To accommodate that opinion, he limited Plaintiff to jobs involving no

11

interaction with the public, less than occasional interaction with co-workers, and only occasional interactions with supervisors. These limitations on Plaintiff's ability to interact also largely account for Dr. Pevnick's opinions that Plaintiff would have significant limitations in the ability to keep social interactions full of excessive irritability, argumentativeness, sensitivity, or suspiciousness; to maintain socially acceptable behavior; to respond appropriately to requests, criticism, suggestions, corrections, and challenges; to perform in proximity to coworkers without being distracted by them or without distracting them due to exhibition of abnormal behaviors; to consistently perform for supervisors without exhibiting insubordinate behavior in response to supervision (e.g., verbally refusing to follow instructions); and to perform in a setting with any contact with the general public.

The ALJ also limited Plaintiff to simple, routine, and repetitive tasks, in a low-stress job with only occasional changes in the work setting, and found that Plaintiff should not work in a fast-paced production job. Although these limitations do not fully account for Dr. Pevnick's opinion that Plaintiff would have extreme or marked limitations in the ability to concentrate, limited ability to initiate and complete tasks in a timely manner, limited ability to ignore or avoid distractions, and limited ability to maintain a pace of production, they do indicate that the ALJ gave some consideration and weight to those opinions and to treatment notes indicating that Plaintiff sometimes exhibited a lack of focus or mildly to moderately impaired judgment.

To the extent that the ALJ did discount Dr. Pevnick's opinions, the Court find that the ALJ gave sufficient good reasons, supported by substantial evidence, to bring the ALJ's decision within the available "zone of choice." First, the ALJ correctly pointed out that several of Dr. Pevnick's objective findings were normal or near-normal: her recent and remote memory were consistently intact; her intelligence was average; she was alert and oriented; her cognition was normal; her

thought process was logical and goal-directed; her insight was typically fair; and her judgment was only mildly or moderately impaired. (Tr. 15-16, 254, 257, 259, 261, 263, 343, 345-46, 347, 349-50, 351-52, 354, 357). These findings appear inconsistent with Dr. Pevnick's opinions that Plaintiff would have marked or extreme limitations in the ability to follow one-or two-step oral instructions to carry out a task; to use reason and judgment to make work-related decisions; to understand and learn terms, instructions, and procedures; and to distinguish between acceptable and unacceptable work performance. The ALJ also reasonably considered Dr. Pevnick's findings that Plaintiff consistently had an absence of suicidal or homicidal ideation and often had a well-groomed appearance; normal speech, normal eye contact, and normal psychomotor activity. (Tr. 15-16, 254, 257, 259, 261, 263, 343, 345-46, 347, 349-50, 351-52, 354, 357). These normal or nearly normal findings tend to undermine Dr. Pevnick's opinion that Plaintiff would have extreme or marked limitations in nearly every area of mental functioning. "[A]n ALJ may discount a treating source opinion that is unsupported by treatment notes." *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016). *See also Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (ALJ properly discounted treating physician's opinion that was inconsistent with physician's own treatment notes); *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (ALJ appropriately discounted treating doctor's limitations when they were inconsistent with the plaintiff's mental status examinations); *Davidson*, 578 F.3d at 843 (affirming ALJ's decision to discount opinion of a treating physician because it was inconsistent with statements in the physician's treatment notes).

Second, the ALJ reasonably considered evidence of Plaintiff's daily activities that was somewhat inconsistent with some of Dr. Pevnick's opinions. (Tr. 15-16). Although Dr. Pevnick found that Plaintiff would have extreme limitations in the ability to function independently and extreme limitations in the ability to work a full day without needing more than the allotted number

13

or length of rest periods, Plaintiff reported being able to engage in activities such as a taking a trip to Bosnia, cooking simple meals such as breads, sandwiches, and stews two to four times weekly for a couple of hours a day; performing light housework (but needing some encouragement to do so); and shopping in stores for groceries, clothing, and household items. (Tr. 15-16, 37, 171-73). Additionally, although Plaintiff reported having trouble getting along with people, she did report spending time with people and talking on the phone, which suggests that she is capable of the minimal social interaction required by the RFC. (Tr. 173). It was not unreasonable for the ALJ to find Plaintiff's ability to do these activities suggested she was more capable of functioning than Dr. Pevnick indicated. *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (finding that the plaintiff's "self-reported activities of daily living provided additional reasons for the ALJ to discredit [the treating doctor's] pessimistic views of her abilities"); *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (ALJ reasonably stated he discounted physician's opinion because the opinion was "more restrictive than self-reported activities").

Third, the ALJ reasonably considered that despite Dr. Pevnick's opinion that Plaintiff would have extreme or marked limitations in every area of mental functioning, Dr. Pevnick continued to treat her only conservatively, with medication and appointments once every one to three months; he did not recommend more frequent or intensive outpatient therapy, nor did he recommend inpatient treatment. (Tr. 18). It was reasonable for the ALJ to find that Plaintiff's conservative course of treatment was at odds with the extreme limitations in Dr. Pevnick's opinion. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (ALJ properly considered a treating physician's "routine, conservative medical treatment" in discounting treating physician's opinions); *Perkins v. Astrue*, 648 F.3d 892, 898-99 (8th Cir. 2011) (holding that an ALJ properly

discounted a treating physician's opinion where, among other flaws, the treating physician's opinion was inconsistent with the conservative nature of the treatment rendered).

Finally, the undersigned notes that although the ALJ did not explicitly discuss all of the factors listed in § 404.1527(c) in evaluating Dr. Pevnick's opinion, he was not required to do so. *See Nishke v. Astrue*, 878 F. Supp. 2d 958, 984 (E.D. Mo. 2012) (ALJ's failure to perform a factor-by-factor analysis of the 20 C.F.R. § 404.1527 factors was not erroneous where the ALJ "explained his rationale in a manner that allowed the [court] to follow his line of reasoning, including stating the amount of weight given to this evidence"); *Derda v. Astrue*, No. 4:09-CV-01847 AGF, 2011 WL 1304909, at *10 (E.D. Mo. Mar. 30, 2011) ("While an ALJ must consider all of the factors set forth in 20 C.F.R. § 404.1527[c], he need not explicitly address each of the factors"). The ALJ cited 20 C.F.R. § 404.1527 in his discussion and discussed some of the relevant factors in his decision, including the consistency of Dr. Pevnick's opinion with his own treatment notes and other evidence and the fact that Dr. Pevnick was Plaintiff's treating psychiatrist. (Tr. 16). The ALJ also "explained his rationale in a manner that allows the [Court] to follow his line of reasoning, including stating the amount of weight given to this evidence." *Nishke*, 878 F.Supp.2d at 984. No more was required to comply with the relevant regulations.

For all of the above reasons, the Court finds that the ALJ's assessment of Dr. Pevnick's opinion was supported by substantial evidence and good reasons. Because the assessment falls within the available "zone of choice," the Court will not disturb it. *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("[T]his Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'").

### B.  The RFC Assessment

Plaintiff's second argument is that the RFC assessment was not supported by substantial evidence, including medical evidence. Plaintiff also argues that the ALJ improperly drew his own inferences from the medical reports and findings, rather than relying on the opinions of medical professionals. In her brief, Plaintiff's arguments are exclusively directed to the mental aspects of the RFC assessment, so the Court addresses only those aspects.

A claimant's RFC is "the most a claimant can do despite her limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)). However, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007).

After consideration of the record as a whole, the Court finds that the RFC assessment was supported by substantial evidence, including medical evidence. As discussed at length above, Plaintiff had significant mental impairments, and the ALJ incorporated several very significant mental limitations into the RFC. However, the ALJ properly considered evidence, including

medical evidence, supporting the conclusion that these conditions were not so severe that they would preclude Plaintiff from performing even simple, routine, and repetitive tasks, in a low stress job that involves very limited interaction with others. This evidence includes much of the evidence discussed above: objective findings showing that Plaintiff's recent and remote memory were consistently intact, her intelligence was average, her thought process was logical and goal-directed, her cognition was normal, she was alert and oriented, her insight was fair, and her judgment was only mildly or sometimes moderately impaired; Plaintiff's reports of daily activities that suggest Plaintiff is capable of some level of focus, concentration, and independent functioning, including shopping, cooking, taking a trip to Bosnia, and interacting with others; and evidence that Plaintiff was treated only conservatively, with medications and visits every one two three months.

Additionally, the RFC finds some support in the opinion of state agency medical consultant Marsha Toll, Psy.D.. On March 9, 2017, Dr. Toll reviewed Plaintiff's medical records and offered her opinions. (Tr. 52-57). Dr. Toll found that Plaintiff would have moderate limitations in several areas of functioning, including the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended period, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public. (Tr. 56). However, she found that Plaintiff would not be significantly limited in the ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to make simple work-related decisions; to ask simple questions or request assistance; to get along with coworkers or peers without distracting them or exhibiting behavior extremes; or to maintain social appropriate behavior. (Tr. 56). Dr. Toll concluded that Plaintiff "has some

moderate limitations, but is able to perform simple work with social restrictions." (Tr. 57). The ALJ found Dr. Toll's opinion was "mostly consistent with the medical record," but found that evidence post-dating Dr. Toll's review of the evidence supported a finding of greater limitations. (Tr. 16). The ALJ thus gave Dr. Toll's opinion "some weight." (Tr. 16). It was appropriate for the ALJ to consider the opinions of Dr. Toll along with the rest of the medical and other evidence in determining the RFC. *See Casey v. Astrue*, 503 F.3d 687, 8, 503 F.3d at 694 ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole.").

The Court finds that the above evidence constitutes substantial evidence, including medical evidence, to support the RFC assessment. Plaintiff argues that the ALJ impermissibly made his own medical findings and drew his own inferences from medical reports rather than relying on medical opinion evidence. The Court disagrees. It was appropriate for the ALJ to discuss and evaluate the objective medical evidence in evaluating Plaintiff's RFC. *See* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."). Moreover, the ALJ did not rely solely on his own evaluation of the objective medical evidence; rather, he relied on the objective medical evidence along with the opinion evidence, the evidence regarding Plaintiff's conservative treatment, and Plaintiff's own reports regarding her daily activities. Although the RFC assessment does not reflect the limitations in any of the opinions in the record, it is well-established that the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians" in determining a claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation marks omitted)). *See also Hensley v. Colvin*, 829

F.3d 926, 932 (8th Cir. 2016) (noting that "there is no requirement that an RFC finding be supported by a specific medical opinion"). Instead, "[i]t is the ALJ's responsibility to determine [claimant's] RFC based on all the relevant evidence." *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted). Here, although the RFC did not mirror any of the particular opinions in the record, the record contained opinion evidence regarding Plaintiff's ability to function from multiple sources. The ALJ properly determined Plaintiff's RFC based on all of the evidence in the record, including opinion evidence.

The Court acknowledges that the record in this case contains conflicting evidence, some of which is supportive of Plaintiff's claims, and the ALJ could have reached a different conclusion with respect to the opinion evidence and the mental RFC assessment. However, it is not the role of this Court to reweigh the evidence presented to the ALJ. The ALJ's weighing of the evidence here fell within the available "zone of choice," and the Court cannot disturb that decision merely because it might have reached a different conclusion.

### C. Plaintiff's Left Shoulder Impairment

The Court next considers Plaintiff's argument that the ALJ erred in finding that her left shoulder impairment was not a severe impairment. As discussed above, at Step Two, the Commissioner must determine whether the claimant has a "severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement . . . ." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). To be a "severe impairment," an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522. "An impairment is not severe if it amounts only to a slight abnormality that

would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard," and the Eighth Circuit has "upheld on numerous occasions the Commissioner' finding that a claimant failed to make this showing." *Kirby*, 500 F.3d at 707 (internal citation omitted).

In assessing Plaintiff's severe impairments at Step Two, the ALJ discussed Plaintiff's adhesive capsulitis of her left shoulder and found that it was not severe, both because it did not have more than a minimal effect on her ability to work and because it had not lasted (nor was expected to last) more than twelve months. (Tr. 14). As the ALJ noted, Plaintiff had pain, tenderness, decreased strength, and painful range of motion in the left shoulder in January 2018, and she received treatment over the next several months. (Tr. 14, 271-73, 275-76, 278-82, 283-87, 291-94, 323-42). As the ALJ also correctly noted, Plaintiff's condition improved substantially over the next few months, especially after she began a course of twice-weekly physical therapy in July 2018. At her first physical therapy appointment, Plaintiff reported that she was in constant low-level pain and had sharp pain with sudden movements; the pain ranged from a 4 to 5 out of 10 to a 9 out of 10. (Tr. 323). She also had limited range of motion. (Tr. 323). At her next few appointments, she still had pain, but her range of motion was improving, and her pain was improving gradually. (Tr. 329, 331-32, 333, 335). By August 17, 2017, Plaintiff reported continued gradual improvement in pain; her pain was at a 1 out of 10 (though she still gets sharp pain with sudden movements); her active and passive range of motion had increased; and it was noted that she was progressing well toward her goals. (Tr. 338-39). Notes from her most recent appointment in the record also show a pain level of 1/10 and no new complaints, though she still had pain with sleeping. (Tr. 341).

In light of these records showing substantial improvement in Plaintiff's left shoulder impairment in a short period of time, the Court finds substantial evidence to support the ALJ's conclusion that Plaintiff's left shoulder impairment would not significantly impact Plaintiff's ability to perform work activities over a period of at least twelve months and thus was not a severe impairment. Therefore, the ALJ's finding at Step Two will be affirmed.

**VI.    CONCLUSION**

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2020.

21